*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

C-SPINE ORTHOPEDICS, PLLC,

Plaintiff-Appellant,

v

PROGRESSIVE MICHIGAN INSURANCE COMPANY,

Defendant-Appellee.

FOR PUBLICATION
December 8, 2022
9:10 a.m.

No. 358170
Macomb Circuit Court
LC No. 2020-001710-NF

C-SPINE ORTHOPEDICS, PLLC,

Plaintiff-Appellant,

v

PROGRESSIVE MICHIGAN INSURANCE COMPANY,

Defendant-Appellee.

No. 358171
Macomb Circuit Court
LC No. 2020-000386-NF

Before: GLEICHER, C.J., and MARKEY and PATEL, JJ.

GLEICHER, C.J.

Jose Cruz-Muniz and Sandra Cruz were injured in a motor vehicle accident and received treatment from C-Spine Orthopedics, PLLC. According to C-Spine's complaint, Progressive Michigan Insurance Company refused to pay its reasonable charges for necessary care it provided to the Cruzes. The Cruzes assigned to C-Spine their rights to seek no-fault personal protection insurance (PIP) benefits from Progressive, and C-Spine brought this first-party no-fault action under MCL 500.3112, which imbues healthcare providers with a statutory right to bring a direct cause of action against an insurer "to recover overdue benefits payable for charges for products, services, or accommodations provided to an injured person."

-1-

Before filing this suit, however, C-Spine entered into assignment agreements of its own with several factoring companies. Factoring companies provide financing to businesses with cash flow issues by purchasing outstanding invoices at a discounted rate. In exchange for sums paid by the factoring companies, C-Spine assigned them its rights to bring first-party lawsuits seeking payment of the outstanding invoice balances. The Cruz invoices were among those bought by the factoring companies.

After the lawsuit was filed, C-Spine and the factoring companies signed counter-assignments and "purchase agreement amendments," reinvesting C-Spine with the right to bring suits seeking payment of outstanding balances. The issue presented is whether C-Spine is entitled to pursue a reimbursement claim against Progressive despite that when the suit was filed, C-Spine had transferred its interests in the Cruzes' debt to the factoring companies.

We hold that the counter-assignments and purchase agreement amendments permit C-Spine to maintain its causes of action under MCL 500.3112, and reverse the circuit court's contrary judgment and remand for further proceedings.

## I. THE RELEVANT FACTS

Sandra Cruz's account balance for C-Spine's treatment is $249,258.38. Jose Cruz-Muniz's account balance for C-Spine's treatment is $37,667.36. Both were treated in 2019. C-Spine filed this lawsuit in May 2020, less than one year after the Cruzes' initial encounters with C-Spine. The Cruzes signed separate assignment agreements after each visit.

The record related to C-Spine's contracts with the factoring companies is not nearly as straightforward. Indeed, it may be charitably characterized as messy, thanks in part to the existence of multiple factoring contracts (at least six), and C-Spine's nondisclosure agreements with several of the factoring companies. Although some of the factoring agreements apparently include the Cruzes' accounts, it is impossible to discern with certainty which factoring companies received interests in the specific transactions underlying the Cruzes' debts. Nor does the record contain the actual factoring agreements; rather, C-Spine provided the circuit court with a "sample" agreement, which it represented contains the same language as the actual agreements. These uncertainties do not matter legally because we assume that the factoring agreements assigned the entirety of C-Spine's interests in the Cruzes' accounts receivable to one or more factoring companies.

The counter-assignments and purchase-agreement amendments are somewhat clearer. They evidence agreements between the factoring companies and C-Spine to transfer, assign, and convey the rights, title, and interests previously acquired from C-Spine back to C-Spine relative to medical services provided to Sandra and Jose. The counter-assignments and amendments reinvest C-Spine with the right to pursue and settle lawsuits. Although at least one of the counter-assignments is dated before C-Spine's lawsuit was filed, the record supports that it was back-dated after this litigation commenced. Other counter-assignments and amendments were signed after C-Spine filed suit.

Progressive moved for summary disposition under MCR 2.116(C)(5) and (10), arguing that C-Spine had assigned its interests in the Cruzes' accounts receivable to the factoring companies and therefore lacked standing, legal capacity, or the legal right to bring claims regarding those

accounts. In response C-Spine relied on the counter-assignments and purchase-agreement amendments, among other arguments.

The circuit court at first denied summary disposition, finding that the counter-assignments had re-conferred an ownership interest in the accounts receivable to C-Spine, rendering C-Spine the real party in interest with standing to file suit. About five months later, however, Progressive again sought summary disposition under MCR 2.116(C)(5) and (10), contending that discovery revealed that at least three of the counter-assignments or amendments to the purchase agreements had been backdated to mislead the court and to disguise that C-Spine had filed suit without any genuine legal interest. C-Spine retorted that although the counter-assignments were executed after the Cruz complaints were filed, C-Spine and the factoring companies had "specified the effective dates" as stated on the face of the counter-assignments, and that "the counter-assignments convey standing to [C-Spine] regardless of the date they were signed."

The circuit court granted summary disposition to Progressive, ruling that C-Spine lacked standing when the complaints were filed and observing that "[i]t was done retroactively after." C-Spine appeals by right.

## II. ANALYSIS

Under MCR 2.201(B), "[a]n action must be prosecuted in the name of the real party in interest" subject to several qualifications. This procedural rule requires that a complaint be brought by the party to whom a claim belongs, or by a party who has a legal right to bring the action. This concept is distinct from standing, which asks whether a litigant has a right to have a court consider a claim.

Standing is not a barrier to C-Spine's case because MCL 500.3112 grants C-Spine the right to "assert a direct cause of action against an insurer . . . to recover overdue benefits payable for charges for products, services, or accommodations provided to an injured person." As a provider, C-Spine has *statutory* standing to bring a claim on its own behalf. "Statutory standing, which necessitates an inquiry into whether a statute authorizes a plaintiff to sue at all, must be distinguished from whether a statute permits an individual claim for a particular type of relief." *Miller v Allstate Ins Co*, 481 Mich 601, 608; 751 NW2d 463 (2008). Whether C-Spine has an actionable claim for relief is a different question than whether it has a right to litigate its current grievance in our courts.

The real-party-in-interest rule does not preclude C-Spine's suit, either. The court rule anticipates that situations such as this one might arise. MCR 2.201(B)(1) provides:

> A personal representative, guardian, conservator, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or *a person authorized by statute may sue in his or her own name without joining the party for whose benefit the action is brought*. [Emphasis added.]

C-Spine is authorized by statute to bring a first-party no-fault claim, and the plain language of the court rule permits it to do so despite that the action was brought for the benefit of the factoring companies, or for the joint benefit of C-Spine and the factoring companies.

This Court has explained the principle underlying MCR 2.201(B)(1) as follows: "A real party in interest is one who is vested with the right of action on a given claim, although the beneficial interest may be in another." *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 95; 535 NW2d 529 (1995). C-Spine is "vested with the right of action" against Progressive based on the assignments from the Cruzes, and is "authorized by statute" to sue in its own name under the plain language of MCL 500.3112. That the "beneficial interest" resided with the factoring companies did not eliminate C-Spine as a real party in interest.

We acknowledge that without the counter-assignments, Progressive might have had a legitimate concern that it could face a second lawsuit brought by the factoring companies.[1] But in this hypothetical situation another court rule would have come into play, permitting the case to go forward with the factoring companies joined as necessary party-plaintiffs. MCR 2.205(A) generally requires that "persons having such interests in the subject matter of an action that their presence in the action is essential to permit the court to render complete relief must be made parties and aligned as plaintiffs or defendants in accordance with their respective interests." This has long been the rule in Michigan. See *DeLong v Marston*, 308 Mich 63, 68-69; 13 NW2d 209 (1944) ("If this suit was brought in the name of a party who is only nominally interested rather than being the real party in interest, it was in the power of the trial court to add or substitute as a party or parties plaintiff the actual parties, rather than to dismiss the bill.").

The necessary joinder rule and real-party-in-interest principles go hand-in-hand to prevent double recoveries and to obviate the risk of subsequent suits. Indeed, the real-party-in-interest requirement exists to "protect[ ] a defendant from multiple lawsuits for the same cause of action." *Kalamazoo v Richland Twp*, 221 Mich App 531, 534; 562 NW2d 237 (1997).

> Statutes requiring every action to be prosecuted in the name of the real party in interest are enacted to protect defendant from being repeatedly harassed by a multiplicity of suits for the same cause of action, but, so long as the defendant's rights are fully protected in the litigation, he cannot complain . . . . [S]o long as the final judgment, when and if obtained, is a full, final, and conclusive adjudication of the rights in controversy that may be pleaded in bar to any further suit instituted by any other party, the defendant is not harmed. [*Kearns v Mich Iron & Coke Co*, 340 Mich 577, 581; 66 NW2d 230 (1954) (quotation marks and citations omitted).]

Even if C-Spine and the factoring companies had not signed the counter-assignments, joinder of the factoring companies would have resulted in a single judgment, eliminating any risk to Progressive of a second lawsuit.

---

[1] We need not decide whether the factoring companies would have standing to sue Progressive, but raise the question. MCL 500.3112 affords "health care provider[s] listed in section 3157" a "direct cause of action against an insurer." MCL 500.3157 refers to a "health care provider," in relevant part, as "a physician, hospital, clinic, or other person that lawfully renders treatment to an injured person for an accidental bodily injury covered by [PIP]." It is unclear whether a factoring company would fall in that category.

We need not dwell on that hypothetical procedural pathway, however, because when the factoring contracts surfaced, C-Spine and its factoring creditors voluntarily entered into counter-assignments and purchase agreement amendments transferring the "beneficial interest" in the Cruzes' no-fault claims back to C-Spine. Those contracts eliminated any risk that Progressive would pay twice for the same benefit claims.

In *Cannon Twp v Rockford Pub Sch*, 311 Mich App 403, 412-413; 875 NW2d 242 (2015), this Court held a mid-litigation assignment changed the real party in interest and thereby preserved the plaintiff's original claim. Cannon Township sued the Rockford Public Schools alleging that the schools' negligence "caused a large volume of water to be discharged into the sewer line, which eventually led to a sewage backup" in the home of Robert and Pamela Mack. *Id*. at 408. The Macks made an insurance claim and also sued the township. The township settled with the Macks for $50,000, agreeing that its insurer, the Michigan Municipal League Liability and Property Pool (MMLLPP), would pay that amount in partial compensation for the damages. *Id*.

> In exchange, the Macks agreed to release the township from any future liability and to "fully assign" to the township their claim "in total, including but not limited to any and all damages in excess of the Settlement Sum and including but not limited to any and all claims against [the schools] related to" the . . . event. [*Id*.]

The parties understood that as the Macks' assignee, the township planned to sue the schools, and that any amount recovered over $50,000 would be remitted to the Macks. *Id*.

The township sued the schools as the Macks' assignee. A year after the suit was filed, the township entered into another assignment agreement, this time with the MMLLPP. Under this agreement, the MMLLPP assigned its subrogation right to pursue a claim against the schools to the township. *Id*. at 408-409. The schools sought summary disposition, arguing among other things that the township was not the real party in interest "because it had paid no money to the Macks and therefore had no basis to pursue an equitable subrogation claim[.]" *Id*. at 409. The trial court denied the motion, and the schools appealed. *Id*. at 40.

This Court noted that "there is no dispute that the township did not suffer damages and did not itself pay any money to the Macks." *Id*. at 412. Because the township was the assignee of the Macks and the MMLLPP, it became "the real party in interest with respect to that cause of action, inasmuch as the assignment vests in the assignee all rights previously held by the assignor." *Id*. Relevant here, we specifically recognized "that the MMLLPP did not assign its rights to the township until after this lawsuit was filed. Therefore, at the time the township initiated the lawsuit, it was not the real party in interest as it pertained to the first $50,000 of damages sought in the complaint." *Id*. This was remedied by an amendment to the complaint, we explained. And although the township did not stand to benefit directly from the suit because it had agreed to remit any damages above $50,000 to the Macks, we clarified that "to be a real party in interest, a plaintiff need only be vested with the right of action on the claim; the beneficial interest may be with another." *Id*. at 413.

We find *Cannon Twp* controlling here. Our approach to the shifting assignments in this case also tracks that of the federal courts applying FR Civ P 17, which uses precisely the same language as MCR 2.201(B). See, e.g., *Hess v Eddy*, 689 F2d 977, 981 (CA 11, 1982), abrogated

on other grounds by *Jones v Preuit & Mauldin*, 876 F2d 1480, 1482 (CA 11, 1989) ("The Rule provides that when an action is brought by someone other than the real party in interest, the suit need not be dismissed if the real party in interest subsequently joins or ratifies the action."); *DeVries v Weinstein Int'l Corp*, 80 FRD 452, 459 (D Minn, 1978) ("An agreement which ratifies the commencement and continuation of an action or reassigns the respective interests is normally sufficient under Rule 17 to cure any real party in interest defects.") (quotation marks and citation omitted).

Finally, we observe that our resolution of the real-party-in-interest issue presented here aligns with the overall purpose of the Michigan Court Rules, which declare at their outset that the "rules are to be construed, administered, and employed by the parties and the court to secure the just, speedy, and economical determination of every action and to avoid the consequences of error that does not affect the substantial rights of the parties." MCR 1.105. C-Spine claims to have provided almost $300,000 worth of services for which it has not been paid. The no-fault act establishes a comprehensive mechanism for resolving this dispute on its merits. Progressive's insistence that C-Spine's failure to obtain the counter-assignments *before* filing suit dooms its claims not only affords Progressive a potential windfall, but contravenes our court rules' animating spirit. "Procedure should be the handmaid of justice," our Supreme Court has declared, "a means to an end," rather than "an end in itself . . . oblivious to the practical needs of those to whose ills it is designed to minister." *Allstate Ins Co v Hayes*, 442 Mich 56, 64; 499 NW2d 743 (1993) (quotation marks and citation omitted). Practically speaking, C-Spine was a real party in interest without the counter-assignments, and eliminated any risk of double recovery by entering into them.

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Sima G. Patel